UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | Case No. 1:12-cv-620 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| MACKTOON, INC., dba | : | |
| ARROW TRANSPORTATION, | : | |
| | : | |
| Defendant. | : | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AFTER TRIAL TO THE COURT**

This civil case is before the Court pursuant to the parties' filings, including witnesses' testimony via videotaped deposition.  The parties expressly agree that all relevant testimony and evidence is now before the Court, and that this case is ripe for final adjudication as upon trial to the Court.  (Docs. 55, 58); *see also* the Court's Notation Order of 8/21/13.  The parties have submitted pretrial briefs and proposed Findings of Fact and Conclusions of Law.  (Docs. 25, 26, 28, and 29).  Thereafter, Defendant submitted a short response brief.  (Doc. 44).  Pursuant to Fed. R. Civ. P. 52, the Court now sets forth and enters its Findings of Fact and Conclusions of Law.

I.     FINDINGS OF FACT

1. Plaintiff Total Quality Logistics, LLC is a freight broker.  (Doc. 2 at 1).  Plaintiff is an Ohio limited liability company with its principal place of business in Clermont County, Ohio.  (*Id.*)  Customers having cargo to transport hire Plaintiff to effect that transportation.  (*Id.*)  Plaintiff, in turn, hires a motor carrier to actually haul the cargo.  (*Id.*)

2. In August, 2011, Versacold hired Plaintiff to arrange transport of a load of Pepperidge Farm frozen bread products from a Versacold cold storage warehouse in Malvern, Pennsylvania to an Americold cold storage warehouse in Clearfield, Utah.[1]  (Doc. 23 at 10-13).

3. Defendant Macktoon, Inc. is a Maryland corporation and trucking company that does business under the name "Arrow Transportation."  (Doc. 24 at 7).

4. Plaintiff hired Defendant to haul the load of frozen bread products from Malvern, Pennsylvania to Clearfield, Utah.  (*Id*. at 14-16; Doc. 57-3).

5. The Rate Confirmation which Plaintiff issued to Defendant for this load directed that Defendant was to maintain the cargo at a temperature of  -10 degrees "continuous."  (Doc. 24 at 15-16; Doc. 57-3).

---

[1] Versacold was subsequently acquired by Americold.  (Doc. 23 at 17-18).  The parties and witnesses refer to the operator of the Malvern, Pennsylvania facility from which the cargo at issue was shipped as Versacold and Americold interchangeably.

6. The Broker Carrier Agreement between Plaintiff and Defendant obligated Defendant to comply with this direction. (Doc. 24-1 at 5). The bill of lading for this cargo also directs "maintain -10 Degree Fahrenheit." (*Id.* at 9).

7. There is undisputed testimony that -10 degrees is an industry standard and a Pepperidge Farm standard. (Doc. 21 at 10; Doc. 22 at 11).

8. Defendant's driver, Keith Macktoon ("Mr. Macktoon"), arrived at the Versacold facility in Malvern, Pennsylvania on August 26, 2011 to pick up a load of 1,862 cases of frozen bread products. (Doc. 57-4).

9. Defendant's refrigeration unit was pre-cooled to -10 degrees prior to picking up the load at Versacold's facility. (Doc. 24 at 89).

10. Mr. Macktoon did not inspect the cargo when it was loaded onto his truck in Malvern and does not know the condition of the cargo when he received it into his truck. (*Id.* at 23-24). The undisputed testimony is that the cargo was in good condition and frozen when it was loaded onto Defendant's truck. (Doc. 23 at 14). Versacold also verified that Defendant's truck was set to keep the cargo at the temperature specified in the bill of lading. (*Id.* at 15).

11. Versacold issued a bill of lading for the cargo. (*Id.* at 11-12; Doc. 57-4). The undisputed testimony is that Versacold would not print a bill of lading unless the cargo was frozen when it was loaded onto Defendant's truck. (Doc. 23 at 23-24).

12. Defendant delivered the cargo to the Americold facility in Clearfield, Utah on August 29, 2011. (Doc. 24 at 29-30). His unloading appointment time was 11:30 a.m. (Doc. 21 at 30).

13. Prior to a carrier's unloading appointment time at the Americold facility, the carrier retains responsibility for the condition of the cargo. (*Id.* at 39).

14. Americold personnel starting to unload the cargo determined that it was a "warm unload," defined as "anything that is a temperature above what the customer requires for their specifications." (*Id.* at 8). The unloading personnel notified Mr. Drew Dunifer. (*Id.*)

15. Mr. Dunifer is the inventory control manager at the Americold facility in Clearfield, Utah. (*Id.* at 5). Mr. Dunifer has held that position for approximately nine years, and has been with Americold for almost 22 years. (*Id.* at 6-7). Americold is a third-party logistics warehouse that handles primarily frozen and refrigerated food products. (*Id.* at 5-6).

16. Mr. Dunifer performed a visual inspection of the cargo and used a digital thermometer to take temperatures. (*Id.* at 11). Mr. Dunifer checked temperatures between cases on several pallets, and the lowest temperatures he could obtain were between 42 and 44 degrees. (*Id.* at 14). Mr. Dunifer also opened a case and took temperatures between interior packages. (*Id.* at 14-15). The coldest temperatures Mr. Dunifer could detect inside the case were between 38.6 and 38.8 degrees. (*Id.*) Mr. Dunifer also used a laser thermometer to take a temperature of the inside

of Defendant's trailer, which registered 50 degrees. (*Id.* at 16). These temperatures "were considered quite high." (*Id.* at 19). The concern is food safety: "not knowing what can happen to this product when it is not maintained at … its required temperature for transportation and storage." (*Id.* at 20).

17. The temperature readings taken at the Americold facility in Utah were e-mailed to Richard Powell, Pepperidge Farm's manager for planning and logistics. (Doc. 22 at 7, 12-13; Doc. 21 at 11-13; Doc. 39-1 at 4). The e-mail to Mr. Powell had attached photographs showing how Americold took the temperature readings reported. (Doc. 22 at 13). Mr. Powell testified that these readings were outside of Pepperidge Farm's specifications and rendered the products in the cargo substandard and not salable. (*Id.* at 14-15, 35-37).

18. Pepperidge Farm directed that the cargo be destroyed. (*Id.* at 24). Powell testified that "we always at Pepperidge Farm in the frozen world we always have the product dumped. That way we know where it goes and we're confident that it can't get out to a customer." (*Id.* at 16).

19. Pepperidge Farm presented a claim to Americold for $41,088.96. (*Id.* at 19; Doc. 39-1 at 7). This amount was calculated as the probable return to Pepperidge Farm had the product been sold plus the cost to dispose of the product. (Doc. 22 at 20-21). This amount was paid by Americold. (*Id.* at 19). Americold made a claim of like amount to Plaintiff which was paid by Plaintiff. (Doc. 38-1 at 7).

## II. CONCLUSIONS OF LAW

1. In this action, Plaintiff seeks damages from Defendant for Defendant's failure to properly perform a contract for interstate carriage of goods.  Therefore, Plaintiff's claim is governed by the Carmack Amendment, 49 U.S.C. §14706.  *See American Synthetic Rubber Co. v. Louisville & Nashville Railroad Co.*, 422 F.2d 462, 466 (6th Cir. 1970); *Excel, Inc. v. Southern Refrigerated Transport, Inc.*, 835 F.Supp. 2d 472, 476 (S.D. Ohio 2011).

2. Under the Carmack Amendment, Plaintiff establishes a *prima facie* case by showing that (1) the cargo was in good condition when it was delivered to Defendant in Malvern, Pennsylvania; (2) the cargo was in damaged condition when Defendant arrived with it in Clearfield, Utah; and (3) damages.  *Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964); *Super Service Motor Freight Co. v. United States*, 350 F.2d 541, 542 (6th Cir. 1965).

3. Once Plaintiff establishes a *prima facie* case, the burden of proof shifts to Defendant to prove (1) that it was not negligent and (2) that the damage to the cargo was caused by (a) an act of God, (b) public enemy, (c) acts of the shipper, (d) public authority, or (e) the inherent vice or nature of the goods.  *Missouri Pacific Railroad Co.*, 377 U.S. at 137; *Plough, Inc. v. Mason and Dixon Lines*, 630 F.2d 468, 470-71 (6th Cir. 1980).  This burden of proof shifts to Defendant and remains there.  *Plough, Inc.*, 630 F.2d at 470-71; *Super Service Motor Freight Co.*, 350 F. 2d at 543.  A corollary to this burden of proof placed on the carrier by

the Carmack Amendment is that other common law defenses are preempted. *Malone v. Mayflower Transit, Inc*., 819 F.Supp. 724, 725 (E.D. Tenn. 1993).

4. Plaintiff has proven its *prima facie* case.  When, as here, "the shipment at issue is in a sealed container, then the carrier has no independent ability to ascertain the contents of the shipment, and the shipper is held to a higher standard of proof … [and t]he bill of lading, by itself, is never sufficient to establish a prima facie case."   Nevertheless, here, beyond the bill of lading, Plaintiff has also shown that the cargo was loaded in good condition by evidencing the Rate Confirmation and the testimony of Daryl Moats of Versacold/Americold in Malvern, Pennsylvania. *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp*., 334 F.3d 997, 1004 (11th Cir. 2003) (citing *Offshore Aviation v. Transcon Lines, Inc*., 831 F.2d 1013, 1014 (11th Cir. 1994).  That evidence shows that the cargo of Pepperidge Farm bread products was to be maintained at -10 degrees throughout shipment. The undisputed testimony of Mr. Moats is that the product was frozen and in good condition when it was loaded onto Defendant's truck and that Versacold verified that the truck was set to maintain the cargo at the temperature required by the Rate Confirmation and bill of lading.  The testimony of Mr. Dunifer shows that the cargo was at a substantially higher temperature than specified, and a temperature well above freezing, at the time the cargo was unloaded from Defendant's truck. The testimony of Mr. Powell establishes that the temperature at the time of unloading was outside of Pepperidge Farm's specifications and rendered the

7

product in the cargo substandard and unsalable. This establishes that Defendant delivered the Pepperidge Farm products in a damaged condition.

5. Plaintiff has also established damages. In the case of goods intended for sale, the proper measure of damages under the Carmack Amendment is "the value the goods would have brought to [their owner] had [the carrier] delivered the shipment without damage." *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990). This is because the purpose of Carmack Amendment damages is to compensate the cargo owner for "what he 'would have had if the contract [of delivery] had been performed.'" *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir. 1973) (quoting *Chicago, Milwaukee, & St. Paul Ry Co. v. McCaull-Dinsmore Co.*, 253 U.S. 97, 100 (1920) (brackets in original)). Here, the product was intended for sale, and the undisputed testimony shows that the probable return to Pepperidge Farm from such sale was $39,488.96 and that Pepperidge Farm paid $1,600.00 to dispose of the product. Pepperidge Farm claimed this amount from Americold and was paid. Americold claimed this amount from Plaintiff and was paid, because Plaintiff hired Defendant.

6. As permitted by paragraph 8 of the parties' Broker Carrier Agreement, Plaintiff has withheld payment from Defendant in the amount of $4,499.88 for the load which Defendant transported from Rigby, Idaho to Swedesboro, New Jersey that is the subject of Defendant's counterclaim. (Doc. 15 at 1-3).

7. Less the amount which Plaintiff was contractually entitled to withhold from Defendant as a set-off (*i.e.*, $4,499.88),  Plaintiff has suffered damages in the amount of $36,589.08.

8. Defendant does not contend that the cargo was damaged by an act of God, public enemy, public authority, or the inherent nature of the cargo.  Rather, Defendant contends that any damage was caused by the acts of the shipper.  Mr. Macktoon testified that he arrived at the Americold facility in Clearfield, Utah between 4:00 a.m. and 5:00 a.m., before the Americold facility had opened for the day.  (Doc. 24 at 29-30).  Mr. Macktoon testified that the refrigeration unit on his trailer stopped operating at 9:50 a.m., and that he told Americold of the problem at 10:00 a.m., but that Americold did not start unloading the truck until 12:40 p.m.  (*Id.* at 34-36).  Mr. Macktoon testified that he was done at Americold between 1:20 p.m. and 1:30 p.m. and that he then "headed toward Idaho."  (*Id.* at 48).

9. There are several reasons to question Mr. Macktoon's testimony.  First, although Mr. Macktoon testified to exact times at which various events occurred on August 29, 2011, he also admits that he did not make any record of when these events occurred.  (*Id.* at 34, 36, 42).  Moreover, Mr. Macktoon could not recall other details of this trip, such as the time of day he loaded in Malvern, Pennsylvania, the time he started from Malvern in route to Clearfield, Utah, the number of stops he made in route, or any of the places he stopped in route.  (*Id.* at 20, 22-25).  It is implausible that Mr. Macktoon would have such precise recall of his truck's

9

unloading at Americold in Clearfield, Utah, given his testimony that the high temperature of his load at delivery was "nothing to think about." (*Id.* at 47, 61).

10. Further, commercial interstate truck drivers are required by federal law to maintain an accurate log. 49 C.F.R. §395.8. The driver is required to certify that the log entries are true and correct. 49 C.F.R. §395.8(f)(7). The log prepared and certified by Mr. Macktoon for August 29, 2011 records that Mr. Macktoon was in his sleeper berth from 12:00 a.m. through 4:00 p.m. on August 29, 2011; and that he unloaded at Clearfield, Utah at 4:00 p.m. (Doc. 24-1 at 23; Doc. 24 at 70-71). The major discrepancy between Mr. Macktoon's testimony and the log which he is required by law to keep accurately substantially diminishes his credibility. Defendant has not carried its burden to show that the damage to Pepperidge Farm's product was caused by Americold. Moreover, Americold was not the shipper. Defendant was hired by Plaintiff. Plaintiff was the shipper as to Defendant.

11. Even accepting Mr. Macktoon's testimony as true, a carrier's responsibility for the cargo ends upon delivery, and in determining when delivery has occurred, "what is controlling is the contract." *Electro Source, Inc. v. United Parcel Serv., Inc.*, 95 F.3d 837, 839 (9th Cir. 1996). The contract in this case is the June 8, 2008 Broker Carrier Agreement between Plaintiff and Defendant. Paragraph 8 of that contract explicitly states that "CARRIER shall become fully responsible/liable for the freight when it takes/receives possession thereof, which responsibility/liability

10

shall continue until delivery of the shipment to the consignee and the consignee signs the bill of lading or delivery receipt." Thus, Defendant retained responsibility for the cargo until Americold signed the bill of lading. There is no dispute that the warm temperature of the cargo was discovered as it was being unloaded from Defendant's trailer. (Doc. 21 at 11, 30-31, 68). Americold signed the bill of lading after Defendant's trailer was unloaded, around 1:15 p.m. (Doc. 24 at 43). Until that time, delivery was incomplete and Defendant was responsible for the cargo.

12. Further, even accepting Mr. Macktoon's testimony as true, Defendant has failed to carry its burden of showing that it was not negligent. Mr. Macktoon testified that the refrigeration unit on his trailer stopped because a fan belt broke. (Doc. 24 at 38). Mr. Macktoon also testified that he determined from the internet that he could get a replacement belt in Clearfield, Utah, and that he could put the replacement belt on in "five minutes." (*Id.* at 38). Mr. Macktoon testified that he did not replace the belt because a receiving clerk at Americold told him "don't worry about it." (*Id.* at 39-40). Although Defendant was hired by Plaintiff, Mr. Macktoon testified that he did not contact Plaintiff about the broken belt, neither when the belt broke nor later. (*Id.* at 46-47). Mr. Macktoon did replace the broken belt later the same day, after he left Americold. (*Id.* at 48-49). By failing to make this simple repair to ensure that its trailer maintained the correct temperature for Pepperidge Farm's products, Defendant failed to exercise

11

reasonable care.

13. "A bailment has been defined as the delivery of goods or personal property by one person to another in trust for a particular purpose, with a contract, express or implied, that the property shall be returned once the purpose has been faithfully executed." *KeyBank Natl. Assn. v. Mazer Corp.*, 2010-Ohio-1508, 188 Ohio App. 3d 278, 286, 935 N.E.2d 428, 434 (2010) (citing *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 830, 621 N.E.2d 1294). Plaintiff has failed to state a claim of bailment. Plaintiff did not have any ownership or possessory interest in the goods at issue and did not deliver the goods to Defendant. In addition, there was no contract that the goods be returned to Plaintiff.

14. Defendant has offered the purported "expert" testimony of Jeffrey Fine, president of American Salvage Liquidators, Inc., that the Pepperidge Farm product had a salvage value of somewhere between 25% and 35% of the product's original value, net of his fees and costs of sale. However, Mr. Fine also testified that he did not know the original value of the product, could not recall any comparable transactions that might indicate a "salvage value" for the Pepperidge Farm bread products, and had not inquired as to the price any particular buyer would be willing to pay for these bread products under the circumstances of this case. Mr. Fine also admitted that, if he were handling salvage of this cargo, it would be possible that the bread products would be donated to charity, creating no salvage value. Mr. Fine's opinion as to a salvage value appears to be based primarily upon

12

his assertion that he knows his customers. Mr. Fine's opinion is speculative.

15. Moreover, the testimony of Mr. Powell makes clear that Pepperidge Farm had the cargo dumped to protect itself against the risk that customers may obtain Pepperidge Farm branded product that was substandard or unfit. This is a legitimate reason not to mitigate damages. *See Eastman Kodak Co. v. Westway Motor Freight, Inc*., 949 F.2d 317, 320 (10th Cir. 1991); *SONY Magnetic Products, Inc. v. Merivienti O/Y*, 668 F.Supp. 1505, 1515 (S.D. Ala. 1987), *aff'd*, 863 F.2d 1537 (11th Cir. 1989). Finally, Plaintiff in this case is Total Quality Logistics, LLC. There is nothing to show that Plaintiff had the ability to cause the Pepperidge Farm products to be sold for salvage, even if a salvage market for the products existed.

16. Mr. Fine also opined that the Pepperidge Farm bread products remained fit for human consumption at the time Defendant delivered them to Americold in Clearfield, Utah. However, the record affirmatively shows that Mr. Fine is not qualified to give such an opinion.

17. Mr. Fine also opined that the temperatures of the cargo which Drew Dunifer of Americold reported to Dick Powell of Pepperidge Farm on August 29, 2011 were erroneous. Yet Mr. Fine admitted that he was not present when those temperatures were taken, has never inspected the cargo, and did not have the records of the temperature inside the trailer which he would usually review when considering a cargo for salvage. In contrast, Mr. Powell of Pepperidge Farm

    testified that he considered the temperatures reported by Americold to be reliable. (Doc. 22 at 14). Mr. Powell had access to photographs showing those temperatures being taken. (*Id.* at 13). Those photographs are not part of the record in this action and, apparently, were not available to Mr. Fine. On this record, the conclusion of Mr. Powell that the temperatures reported by Americold were reliable is persuasive as the more reasonable conclusion.

18. In summary, Plaintiff has carried its burden of proof in demonstrating its entitlement to compensation under the Carmack Amendment as a result of Defendant's breach of contract and negligence in delivering the cargo. Defendant has not carried its burden of proof. Accordingly, Plaintiff is entitled to judgment against Defendant in the amount of $36,589.08, together with interest thereon at the rate specified in 28 U.S.C. §1961(a) from December 13, 2011 until paid.

### III. CONCLUSION

Therefore, the Clerk shall enter judgment accordingly. Motions for attorney fees and costs, if any, with supporting affidavits and evidence, must be filed within 28 days from the entry of these Findings of Fact and Conclusions of Law.

    **IT IS SO ORDERED**.

Date: 2/19/14                                                */s/ Timothy S. Black*
                                                             Timothy S. Black
                                                             United States District Judge